FILED
April 16, 2018
Carla Bender
4th District Appellate
Court, IL

2018 IL App (4th) 170059

NO. 4-17-0059

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD and UNIVERSITY PROFESSIONALS OF ILLINOIS, LOCAL 4100, IFT-AFT, AFL-CIO, Respondents. | ) ) ) ) ) ) ) ) ) ) | Review of Order of the Illinois Educational Labor Relations Board No. 2016-RS-0006-S |

JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices DeArmond and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1 The Board of Trustees of the University of Illinois (Board of Trustees) seeks direct review of a decision of the Illinois Educational Labor Relations Board (Board), finding department chairs at its Springfield campus were entitled to be included in a bargaining unit consisting of all tenured and tenure-track faculty. The Board of Trustees argues we should reverse the Board's decision because it is based on a clearly erroneous determination the department chairs are not managerial employees, supervisors, or confidential employees as defined by the Illinois Educational Labor Relations Act (Act) (115 ILCS 5/2(g), (n), (o) (West 2016)). The Board's determination the department chairs are not managerial employees is clearly erroneous. We reverse.

¶ 2                                    I. BACKGROUND

¶ 3                          A. Overview of the University of Illinois

¶ 4          The University of Illinois (University) is a large public institution, employing

approximately 23,000 persons on three main campuses. The three main campuses are located in

Urbana-Champaign, Chicago, and Springfield. The University system is governed by the

University of Illinois Statutes (University Statutes). The University Statutes set forth the policies

and procedures of the University and defines the structure, positions, and functioning of the

University.

¶ 5          The Board of Trustees is the governing body of the University system. The Board

of Trustees elects a president, who serves as the University system's chief executive officer. At

each campus, a chancellor/vice president serves as the chief executive officer. The

chancellor/vice president oversees campus affairs. Each campus also has a provost/vice

chancellor, who serves as its chief academic officer. The provost/vice chancellor oversees the

faculty and academic affairs as well as manages the budget for the functions he or she oversees.

¶ 6          Each campus is comprised of several academic colleges. Each academic college

covers a broad academic area of study. The University's Springfield campus is divided into four

academic colleges: (1) the College of Liberal Arts and Sciences; (2) the College of Education

and Human Services; (3) the College of Public Affairs and Administration; and (4) the College

of Business and Management. A dean oversees each college, including its academic programs,

faculty, and the infrastructural aspects of the college.

¶ 7          Each college is divided into smaller areas of study, called departments. The

department is the primary unit of education and administration within the University. Each

department has an executive officer, called the department head or chair.

¶ 8 The University system operates under a "shared governance" model, meaning the faculty, administrators, and Board of Trustees share in the governance of the institution. The University Statutes provide:

> "As the responsible body in the teaching, research, and scholarly activities of the [u]niversity, the faculty has inherent interests and rights in academic policy and governance. Each college or other academic unit shall be governed in its internal administration by its faculty ***. Governance of each academic unit shall be based on unit bylaws established and amended by the faculty of that unit. The bylaws shall provide for the administrative organization and procedure of the unit ***. Except that they may not conflict with these Statutes, or other specific actions of the Board of Trustees, or with the bylaws of a unit which encompasses it, the details of the bylaws are left to the faculty of the unit."

¶ 9 B. Certification of Tenure-System Faculty

¶ 10 In February 2015, the Board's executive director certified the University Professionals of Illinois, Local 4100, IFT-AFT, AFL-CIO (Union), as the exclusive representative of a bargaining unit of tenured and tenure-track faculty employed at the University's Springfield campus. The certification specifically excluded department heads and chairs and all managerial employees, supervisors, and confidential employees as defined by the Act.

¶ 11                    C. Majority-Interest Representation Petition

¶ 12         In May 2016, the Union filed a majority-interest representation petition, seeking to add 28 employees at the University's Springfield campus with the title of department chair to the existing tenure-system faculty bargaining unit. The Board of Trustees opposed the petition, asserting the department chairs were ineligible for membership because they were managerial employees, supervisors, and/or confidential employees as defined by the Act.

¶ 13                           D. Administrative Hearing

¶ 14         In June 2016, an administrative law judge (ALJ) conducted a three-day hearing. The Board of Trustees presented the testimony of six witnesses: (1) Renee Taylor, vice provost for faculty affairs and professor of occupational therapy at the University's Chicago campus; (2) Leonard Branson, accountancy department chair at the University's Springfield campus; (3) Rassule Hadidi, management information systems head and former department chair at the University's Springfield campus; (4) James Ermatinger, provost/vice chancellor for academic affairs and interim dean of the College of Public Affairs and Administration at the University's Springfield campus; (5) Hanfu Mi, dean of the College of Education and Human Services at the University's Springfield campus; and (6) Lucia Vasquez, acting dean of the College of Liberal Arts and Sciences at the University's Springfield campus. The Union presented the testimony of five current or former department chairs at the University's Springfield campus: (1) Deborah Anthony, legal studies department chair; (2) Amy McEuen, biology department chair; (3) Heather Bailey, history department chair; (4) Richard Gilman-Opalsky, political science department chair; and (5) Kristi Barnwell, history department chair and vice president of the tenure-system faculty bargaining unit. The parties also presented various exhibits, including,

*inter alia*, the following relating to the Springfield campus: (1) the University Statutes, (2) the faculty personnel policy, (3) the collective bargaining agreement between the University and its graduate assistants, (4) grievance-arbitration procedure proposals relating to the first contract of the tenure-system faculty bargaining unit, and (5) departmental faculty bylaws.

¶ 15          1. *Departments at the University's Springfield Campus*

¶ 16          Within the four colleges at the University's Springfield campus are 32 academic departments, which employ 193 full-time faculty members and 165 part-time nontenure faculty members (adjuncts). The Springfield campus has 28 department chairs. The 28 department chairs serve 30 academic departments. The two remaining departments are served by department heads. The Union did not seek to add employees with the title of department head to the tenure-system faculty bargaining unit.

¶ 17          2. *The Selection and Removal of Department Chairs*

¶ 18          The University Statutes provide department chairs are appointed annually by the Board of Trustees on recommendation of the president and the chancellor/vice president after consultation with the dean of the college and the executive committee of the department concerned. A department's executive committee is elected annually by and from a department's faculty.

¶ 19          Each department, through its bylaws, sets provisions for the selection of proposed department chairs. Generally, chairs are selected from and by the department faculty for one or more three-year terms, after which they resume their regular faculty role. In some departments, chairs rotate terms among the tenured faculty. Other departments have long-standing chairs who are chosen based on their seniority within the department. In other cases, a dean may solicit

nominations and deliver ballots to the department's tenure-system faculty to select their choice for chair by a majority vote. Although not required, chairs normally are tenured faculty members. Anthony explained her department typically chooses a tenured professor because chairs might "have to stick their neck out a little bit," and nontenured professors are "in a more vulnerable position in doing that if they're trying to represent the department to administration."

¶ 20 After the faculty has selected their proposed department chair, the dean will review the faculty's selection. The dean rarely rejects the faculty's selection. If the faculty's selection is rejected, the department may hold another vote, or the dean may elect to either appoint a chair or have the dean's office provide administrative support to the department. The provost and the Board of Trustees must also approve the faculty's selection. Taylor explained, while the appointment of a chair involved significant collaboration with a department's faculty, the Board of Trustees did not allow the faculty to directly appoint a chair because the chair was also responsible for carrying out the agendas of the college and the University.

¶ 21 Each department, through its bylaws, also sets provisions for the removal of department chairs. Removal of a chair normally requires concurrence of both the department and the dean. A dean can remove a chair without consent from the department's faculty. A dean can object to a faculty's vote to remove a chair. If the dean objects to the faculty's vote to remove a chair, the faculty may override the dean's wishes by a majority vote to remove.

¶ 22 3. *The Responsibilities of Department Chairs as Provided in the University Statutes*

¶ 23 The University Statutes provide department chairs "shall be responsible for the formulation and execution of departmental policies and the execution of University and college

policies insofar as they affect the department." Chairs are required to:

"(1) report on the teaching and research of the department; (2) have general oversight of the work of students in the department; (3) collaborate with the executive committee in the preparation of the budget and be responsible for the expenditure of departmental funds for the purposes approved by the executive committee; and (4) call and preside at meetings of the executive committee and at meetings of the department faculty of which there shall be not fewer than one in each academic year for consideration of questions of departmental governance and educational policy."

¶ 24 The University Statutes provide department chairs have the power to "act independently in such matters as are delegated to the chair by the executive committee." A department chair is *ex officio* a member and chair of the executive committee. When the executive committee is in session to evaluate the chair's performance, the chair does not partake in the session and the committee is chaired by a different committee member.

¶ 25 The University Statutes provide both the department chair and the executive committee "are responsible for the preparation of the budget and for such matters as may be delegated to them by the faculty of the department." The chair "together with the executive committee is responsible for the organization of the work of the department and for the quality and efficient progress of that work."

¶ 26 Taylor described the roll of the executive committee as a committee that advises the chair on a range of issues. She also indicated the chair has the ultimate authority as a decision

maker.

¶ 27    4. *The Responsibilities of Department Chairs*
*as Provided in the Faculty Personnel Policy*

¶ 28    The faculty personnel policy in effect at the University's Springfield campus

provides:

"Department administrators, irrespective of whether they are called

[d]irectors or [c]hairs, have similar functions and responsibilities.

Functions of department administrators are the following: provide

effective leadership for faculty in the department/division; assume

responsibility for seeing that decisions assigned to the

department/division by university policies and procedures are

made and communicated to others in the [u]niversity; convey

recommendations concerning such matters as curriculum

development, budgetary requests, position requests, multi-year

schedules, and faculty development activities. Responsibilities of

department administrators include overseeing, supervising[,]

and/or coordinating the following: the work of faculty in the

development of department curriculum, educational philosophy[,]

and academic standards and the department's long-term planning

efforts; coordinate formal reviews of degrees and certificates (if

applicable), oversee preparation of documents for follow-up and

accreditation review, prepare documents for curricular changes,

catalog revisions and other documents necessary to convey the department's curricular plans; develop multi-year course schedules and staffing plans for curricular delivery, consistent with institutional priorities and student needs. Prepare annual course schedule documents and faculty assignment summary sheets for faculty approval, and coordinate curricular delivery and make recommendations about non-instructional assignments; lead and participate in the selection and development of full and part-time faculty; oversee faculty searches in accordance with [u]niversity polices and procedures; develop and coordinate student recruitment, retention, advising[,] and service activities of the unit; implement and monitor admissions, student progress[,] and closure requirements of the department's degree(s) and certificates(s) (if applicable), as well as professional certification or registration of students; represent the department(s) to external organizations and groups, inter-institutional activities and accrediting agencies; lead the department(s) in developing budget requests and priorities and approve expenditures according to them; oversee selection and supervision of the department graduate assistants and student workers as appropriate; direct the work of support staff; communicate information to and from the dean and appropriate governance bodies and report the results of department actions and

deliberations; ensure representation of the department(s) on appropriate [c]ollege-level committees; represent department(s) at [c]ampus and [u]niversity level meetings; lead the development of public affairs activities in the department(s) and the offering of general education courses; oversee students' clubs, honorary societies, advisory committees, etc."

¶ 29 The faculty personnel policy further provides that the necessary amount of support required of department chairs will depend on a variety of factors relating to the department being administered, such as the number of degree programs available.

¶ 30 5. *Leadership Meetings*

¶ 31 Department chairs are required to attend their respective colleges' cabinet meetings. The college cabinet consists of the dean and the chairs. At the cabinet meetings, the dean and chairs discuss various issues concerning the college, including the budget, the direction of the college, faculty resources, and strategic and policy issues. A dean may task chairs with handling various assignments delegated from the provost's office.

¶ 32 After the union certification of tenure-system faculty, department chairs attended a meeting with the labor relations representative and the University's labor relations lawyer. At the meeting, they discussed the need for "confidentiality concerning the position of the administration *vis a vis* the Union." They also discussed acceptable communication between the chair and other faculty members, such as the need to avoid any discussion of whether a particular faculty member had signed a union card.

¶ 33 6. *Adjunct Faculty*

¶ 34        Department chairs initiate the hiring of adjunct faculty. Chairs first determine whether the need for additional classes exists based on enrollment and the course load of tenure-system faculty. Some departments hire the same adjuncts on a regular basis. In other departments, when the need to hire adjuncts arises, the chair finds a suitable candidate through referrals or other means, without faculty input. In some departments, the chair consults with the tenure-system faculty concerning the selection of adjuncts. In all cases, whether an adjunct candidate is chosen unilaterally by the chair or by faculty consensus, the chair makes a recommendation to the dean, who is the hiring authority. The dean rarely, if ever, declines to hire a recommended candidate.

¶ 35        Department chairs are responsible for evaluating adjunct faculty. Some department chairs evaluate adjunct faculty and make decisions regarding whether to retain or rehire them without faculty input. A chair's decision as to whether to retain an adjunct is not subject to approval by the dean.

¶ 36                                   7. *Graduate Assistants*

¶ 37        Department chairs oversee graduate assistant hiring. Department committees are delegated with the responsibility of selecting graduate assistants. Chairs are required to sign off on a committee's selection. The selection of graduate assistants must be approved by the dean, though the dean rarely rejects the chair's recommendation.

¶ 38         Department chairs are responsible for supervising, or choosing a supervisor for, each graduate assistant. Chairs are also responsible for reviewing and evaluating the work of graduate assistants. Chairs typically prepare evaluations and submit them to the dean and the provost, who must sign off on the evaluations. As with adjuncts, chairs need not consult with

other faculty in the department when deciding how to evaluate a graduate assistant's work.

¶ 39                                    8. *Tenure-System Faculty*

¶ 40            Tenure-track faculty hiring follows a specific process. First, the department chair must obtain approval, through the dean, to create or maintain a tenure-track position. If the chair obtains approval, the department forms a search committee, which prepares a search plan setting forth how it will search for and select candidates and submits it to the dean for approval. Upon approval of the plan, the search committee advertises and recruits for the position, vets candidates, and ultimately recommends three candidates to the dean. In some departments, the chair serves on the selection committee and is responsible for preparing the search plan, appointing faculty to serve on the selection committee, and ensuring the proper selection process is followed. In other departments, the chair need not serve on the selection committee but still must sign the search committee plans or reports. The dean makes the final candidate selection, conveys the offer of employment, and negotiates salary with the incoming candidate.

¶ 41            A department-level personnel committee conducts tenure-system faculty evaluations. While department chairs are not required to serve as chairs of the personnel committee, chairs remain responsible for ensuring the department conducts the evaluation process as prescribed by the University. The personnel committee reviews each faculty member, including the chair, in the areas of teaching, service, and research. A recommendation letter is then prepared summarizing the committee feedback and rating, identifying whether the faculty member is recommended for "no merit," "merit," or "extra merit." The chair typically, but not always, prepares the letter.

¶ 42            Faculty evaluations are reviewed by a college-level committee, in accordance

with campus-wide standards and college merit pay policies and procedures. In the College of Business and Management, for example, the executive committee, comprised of one elected member—typically the chair—from each department in the college, makes merit pay decisions. The executive committee reviews all of the recommendations submitted by each department and makes its own determination of which faculty members to nominate for salary increases. Those nominations are submitted to the dean, who in most cases accepts the recommendations and submits them to the provost.

¶ 43                              9. *Departmental Budgets*

¶ 44          Department chairs operate as the fiscal officers responsible with managing their department's operational budget. Each department has an operational budget, which usually consists of approximately $2000. Because of their fiscal responsibilities, chairs are required by statute to submit a statement of economic interests to the Secretary of State each year. Chairs may disburse money from the operational budget for any reasonable purchases in accordance with University rules without approval from the dean. For example, the operational budget may be used to cover the costs of laboratory supplies, office supplies, and computer equipment, or to cover the costs associated with special events. In some departments, the faculty decides by consensus how to spend the funds. Any requests to use the funds for purposes outside the norm must be approved by the dean.

¶ 45          Department chairs also manage a department fund consisting of a portion of the proceeds obtained through online course fees. The money may be used only for expenditures related to online instruction, such as purchasing computer equipment to facilitate a course offering or granting stipends for course development. The management information systems

department's annual online budget is approximately $20,000 to $25,000. Chairs may solicit faculty input on how to expend the funds. A chair must submit a request to expend the money to the dean, who typically approves the request.

¶ 46　　　　Each department also has access to professional development funds through the chancellor's office. Faculty may apply for these funds to cover certain expenses, such as the cost of attending or presenting at a professional conference. The chair is not involved in approving disbursement of these funds.

¶ 47　　　　　　　　10. *Course Scheduling and Accreditation*

¶ 48　　　　Department chairs are responsible for ensuring department course schedules are prepared and submitted to the dean. Chairs typically prepare the schedule, taking the previous year's schedule and faculty preferences into account. In some departments, the chair must consult with other department chairs to compare schedules and ensure course requirements do not conflict. In some cases, chairs prepare the schedule at faculty meetings.

¶ 49　　　　On occasion, chairs must ask faculty to adjust their scheduling preferences to ensure the necessary balance of course offerings. Conflict amongst faculty concerning scheduling preferences is typically resolved collectively between the chair and the concerned faculty members. In the event a conflict cannot be resolved, Gilman-Opalsky testified he did not believe he had the authority to force a faculty member to teach a particular class. Conversely, Hadidi testified to an incident where a faculty member left the University after Hadidi told the faculty member, who refused to teach an online class, "that this is the direction that we are going" and "[i]f you are here you need to teach online."

¶ 50　　　　Department chairs oversee their programs' formal reviews and accreditation

reporting. Chairs receive data concerning their departments, which must be analyzed and evaluated. Chairs may assign this task to faculty members, but the chair is responsible for submitting the department's internal evaluation. Chairs must assure accreditation reports are completed.

¶ 51 11. *Student Recruitment and Retention*

¶ 52 To further the University's goals of increasing the student body, department chairs are expected to coordinate a representative from their department to be present at University events. To help retain students, chairs are also expected to lead faculty by encouraging student mentorship.

¶ 53 12. *Complaints, Grievances, and Disciplinary Issues*

¶ 54 Department chairs currently handle disputes between faculty and informal complaints raised by students and University support staff. Chairs may take a variety of different actions to resolve the disputes and complaints. If a dispute or complaint cannot be resolved with the department chair, it is referred to the dean's office.

¶ 55 The Board of Trustees and the Union are in the process of bargaining the tenure-system faculty's first contract. During bargaining, the Board of Trustees offered two proposals and the Union offered a counterproposal concerning the contract's grievance-arbitration procedure. Under the Board of Trustees' first proposal, the grievance-arbitration process would begin by a faculty member filing a written grievance with its department's chair or head. After the chair or head rendered a written decision, the faculty member could appeal the decision to the dean of the college in which the faculty member was appointed. The Union's counterproposal provided the grievance-arbitration process would begin with a faculty member informally

discussing the situation with his or her "immediate supervisor." If the informal conference did not prompt a solution, the faculty member would be allowed to file a formal written grievance with the vice chancellor of academic affairs. Under the Board of Trustees' responding proposal, the grievance-arbitration process would begin with a faculty member informally discussing the situation with his or her "Department Head/Chair." If the informal conference did not prompt a solution, the faculty member would be allowed to file a formal written grievance with the dean of the college in which the faculty member was appointed. The University's collective-bargaining agreement with its graduate assistants employed at the Springfield campus follows a similar grievance-arbitration approach as the Board of Trustees' responding proposal.

¶ 56          The University Statutes provide procedures for faculty discipline. At a minimum, faculty members are provided notice and an opportunity for a hearing. Chairs have no authority to suspend or discharge tenure-system faculty. Department chairs are obligated, however, to report to the dean a faculty member's failure to do their job. For instance, Ermatinger testified to an occasion where a chair reported a faculty member was refusing to communicate with the chair. Ermatinger met with the chair and had discussions to work on strategies to resolve the issue. Ermatinger described the meetings as sensitive in nature and voiced concern over disclosure of the conversation to third-parties, such as the faculty member in question.

¶ 57                              13. *Reduced Teaching Schedule*

¶ 58          Department chairs are allowed to have a reduced teaching schedule to compensate for the chair duties. Taylor testified chairs are given teaching relief so they may "function as an administrator and do the management and the supervising that that person needs to do."

¶ 59          Tenure-system faculty members are expected to teach three courses per semester,

for a total of six classes per academic year. Of the 28 department chairs, 23 teach a half-schedule. Chairs are expected to continue their general faculty responsibilities relating to research and service to the University. In addition to their faculty duties of advising current students, chairs must also advise new students, incoming transfers, and former students seeking to complete advanced degrees.

¶ 60                    14. *Time Spent on Chair Duties and Responsibilities*

¶ 61            The majority of the department chairs and former chairs who testified at the hearing reported, as a general rule, they spent approximately one-third, or slightly more, of their time discharging chair duties and responsibilities. One chair testified he spent more than half of his time performing his chair duties. Another chair testified he spent "significantly more" time on his chair functions than his faculty responsibilities. Chairs typically receive one-month's compensation, the equivalent of teaching a summer school course, for serving as a chair.

¶ 62                    15. *Strain on Faculty Duties*

¶ 63            Branson testified:

> "As a department chair the scope is much bigger. [You are] responsible for more than just yourself and your own classes, your own research. So the biggest difference is, I guess, the scope of the work and then the nature of it is *** planning for the whole department as opposed to planning your own courses and, again, I think it boils down to scope of the work and then the nature of the work is, it's different to teach a class than it is to plan all the classes and make them fit together. It's a different function."

With respect to his department, Gilman-Opalsky indicated the faculty lacked a desire to be a chair because the duties with such a position are "spate from the normal faculty commitments and they \*\*\* regrettably crowd out some of the time we can spend on the [those] faculty commitments." Vasquez indicated at one point in her career she resigned from being a chair because she was "exhausted" from its responsibilities. Branson indicated at one point in his career he resigned from being a chair to have more time to pursue his interests in research and professional outreach, "which were very difficult to do when you're serving as a department chair."

¶ 64                                    E. Recommended Decision and Order

¶ 65            In September 2016, the ALJ issued a recommended decision and order. The ALJ (1) found the department chairs are neither managerial employees, supervisors, nor confidential employees as defined by the Act and (2) recommended the Board certify the Union as the exclusive bargaining representative for the chairs.

¶ 66                                    F. The Board of Trustees' Exceptions

¶ 67            In October 2016, the Board of Trustees filed exceptions to the ALJ's recommended decision and order. The Board of Trustees argued, *inter alia*, the ALJ erred in concluding the department chairs are neither managerial employees, supervisors, nor confidential employees as defined by the Act.

¶ 68                                    G. The Board's Decision and Order

¶ 69            In December 2016, the Board issued a decision and order, affirming the ALJ's recommended decision and directing certification of the bargaining unit. The Board found the department chairs were entitled to inclusion in the tenure-system bargaining unit because they

- 18 -

are neither managerial employees, supervisors, nor confidential employees as defined by the Act.

¶ 70                          1. *Managerial Employees*

¶ 71        The Board rejected the Board of Trustees' argument suggesting the department chairs are managerial employee as defined by the Act. It found:

> "[T]he department chairs at [the] University's Springfield campus do not have the authority and discretion which are necessary to establish managerial status. Rather, the University Statutes and the testimony establish that, as in [*Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197 (IELRB 1988)], the faculty share authority with the chairs. In addition, as in [*Board of Trustees of Southern Illinois University*], the chairs' role is to represent the departments to higher levels of administration rather than the reverse. The chairs' role in the college cabinets is to act as liaisons between the deans and the department faculty rather than to exercise the type of independent authority to determine the means by which the University's goals will be achieved which is necessary for managerial status. In any event, the department chairs' participation in the college cabinets is not 'uppermost in importance and influence' among their functions. The chairs' predominant role is to work with the faculty in operating the departments. We conclude that the department chairs are not managerial employees."

¶ 72                          2. *Supervisors*

¶ 73          The Board rejected the Board of Trustees' argument suggesting the department

chairs are supervisors as defined by the Act. The Board conceded the chairs have the authority to

perform or to effectively recommend some of the functions of a supervisor with respect to

adjunct faculty, such as hiring and discharging. However, it found they did not spend a

preponderance of their employment time supervising adjunct faculty. The Board reasoned:

> "Here, almost all department chairs have a half-time or more
>
> teaching load. They also perform other duties which are not
>
> supervisory, including research, service to the community, and
>
> their non-supervisory duties as department chairs. Therefore, it is
>
> not mathematically possible for the department chairs to spend
>
> more time on supervisory functions than on any one non-
>
> supervisory function with respect to adjunct faculty."

The Board also found the chairs did not exercise independent judgment when scheduling classes.

¶ 74                          3. *Confidential Employees*

¶ 75          The Board rejected the Board of Trustees' argument suggesting the department

chairs are confidential employees as defined by the Act. It found:

> "Assuming that it is reasonable to expect that the department chairs
>
> will become the first step in the grievance procedure in the
>
> collective bargaining agreement covering the tenure system faculty
>
> at the University's Springfield campus, they still would not have
>
> access to the type of information [related to the collective-

bargaining process between labor and management]. Accordingly, we conclude that the department chairs are not now and will not become confidential employees."

¶ 76                                    H. Certification

¶ 77        In January 2017, the Board's executive director issued an order certifying the bargaining unit to include all full-time "tenured and tenure track employees and department chairs."

¶ 78        The Board of Trustees now seeks direct review of the Board's decision.

¶ 79                                    II. ANALYSIS

¶ 80        The Board of Trustees argues we should reverse the Board's decision because it was based on a clearly erroneous determination that department chairs at its Springfield campus are neither managerial employees, supervisors, nor confidential employees as defined by the Act. Both the Board and the Union disagree.

¶ 81                                    A. The Act

¶ 82        The Act grants all educational employees the right to engage in collective bargaining. 115 ILCS 5/3(a) (West 2016). It excludes from the definition of " '[e]ducational employee' " those who are managerial employees, supervisors, or confidential employees. *Id.* § 2(b). Managerial employee, supervisor, and confidential employee are terms specifically defined by the Act. *Id.* § 2(g), (n), (o).

¶ 83                                    B. Standard of Review

¶ 84        In reviewing whether the Board erred in determining the department chairs are neither managerial employees, supervisors, nor confidential employees as defined by the Act, the

parties contend we should apply the clearly erroneous standard of review. We agree. The Board

of Trustees' argument requires us to consider the Board's application of the facts to the pertinent

statutory definitions or exemptions. That is, we are presented with a mixed question of fact and

law, which warrants application of the clearly erroneous standard of review. *Board of Education*

*of Glenview Community Consolidated School District No. 34 v. Illinois Educational Labor*

*Relations Board*, 374 Ill. App. 3d 892, 899, 874 N.E.2d 158, 164 (2007). We will reverse the

Board's decision only if its determinations concerning the applicability of the statutory

definitions or exemptions are clearly erroneous. *Id.* A determination will be deemed clearly

erroneous if we, based on the entire record, are " 'left with the definite and firm conviction that a

mistake has been committed.' " (Internal quotation marks omitted.) *Id.* (quoting *AFM Messenger*

*Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393, 763 N.E.2d 272, 280-

81 (2001)).

¶ 85                                      C. Board of Trustees' Burden

¶ 86          Because the pertinent statutory definitions or exemptions preclude educational

employees from exercising the panoply of rights set forth in the Act, we construe them narrowly.

*One Equal Voice v. Illinois Educational Labor Relations Board*, 333 Ill. App. 3d 1036, 1042,

777 N.E.2d 648, 653 (2002). Additionally, the Board of Trustees, as the party asserting the

exemptions, had the burden of producing sufficient evidence to support its position. *Board of*

*Education of Glenview Community Consolidated School District No. 34*, 374 Ill. App. 3d at 899.

¶ 87                                      D. Managerial Employees

¶ 88          The Board of Trustees contends we should reverse the Board's decision because it

was based on a clearly erroneous determination that the department chairs are not managerial

- 22 -

employees. The Board of Trustees asserts the record shows the chairs are predominantly engaged in executive and management functions and charged with the responsibility of directing the effectuation of management policies and practices.

¶ 89       To resolve this issue, we turn to the statutory language and the case law and administrative decisions applying that language. In addition, because an identical definition for " '[m]anagerial employee' " can be found in the Illinois Public Labor Relations Act (5 ILCS 315/3(j) (West 2016)), we consider case law applying that language. See *Chicago Teachers Union v. Illinois Educational Labor Relations Board*, 296 Ill. App. 3d 785, 791, 695 N.E.2d 1332, 1336 (1998).

¶ 90       Section 2(o) of the Act (115 ILCS 5/2(o) (West 2016)) defines " '[m]anagerial employee' " as

> "an individual who is engaged predominantly in executive and
> management functions and is charged with the responsibility of
> directing the effectuation of such management policies and
> practices."

Accordingly, to be excluded from collective bargaining as a managerial employee, department chairs must be (1) engaged predominantly in executive and management functions and (2) charged with the responsibility of directing the effectuation of management policies and practices.

¶ 91       The first part of the statutory definition of managerial employee relates to what an employee does—the " 'executive and management functions.' " (Internal quotation marks omitted.) *American Federation of State, County, & Municipal Employees (AFSCME), Council*

*31 v. State*, 2014 IL App (1st) 130655, ¶ 20, 25 N.E.3d 52 (Department of Central Management Services, respondent (Illinois Commerce Commission)). While the Act does not define "executive and management functions," we have previously found those functions relate to " 'running an agency or department, such as by establishing policies and procedures, preparing the budget, or otherwise assuring that the agency or department operates effectively.' " *Department of Central Management Services v. Illinois Labor Relations Board, State Panel*, 2011 IL App (4th) 090966, ¶ 134, 959 N.E.2d 114 (quoting *Department of Central Management Services/Illinois Commerce Comm'n v. Illinois Labor Relations Board, State Panel*, 406 Ill. App. 3d 766, 774, 943 N.E.2d 1136, 1143 (2010)).

¶ 92     The first part of the statutory definition also requires the employee to be "engaged predominantly" in executive and management functions. To determine whether an employee is engaged predominantly in executive and management functions, we look not only to the time spent on those functions but also their significance. *American Federation of State, County, & Municipal Employees (AFSCME), Council 31*, 2014 IL App (1st) 130655, ¶ 29. That is, we consider whether the functions "are 'uppermost in importance and influence.' " *Chicago Teachers Union*, 296 Ill. App. 3d at 793 (quoting *Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197).

¶ 93     The second part of the statutory definition relates to how the agency or department is run—whether the employee in question has the responsibility of directing the effectuation of management policies and practices. *Department of Central Management Services*, 2011 IL App (4th) 090966, ¶ 135. "[M]anagerial employees do not merely recommend policies or give advice to those higher up the employment chain, 'they actually direct the governmental

enterprise in a hands-on way.' " *Id.* (quoting *Department of Central Management Services/Illinois Commerce Comm'n*, 406 Ill. App. 3d at 775). The requisite responsibility to confer managerial status will be found where an employee has (1) the independent authority to establish and effectuate policy, or (2) the ability to make recommendations that are almost always implemented. *Id.*; see also *Office of the Cook County State's Attorney v. Illinois Local Labor Relations Board*, 166 Ill. 2d 296, 301, 652 N.E.2d 301, 303 (1995) (" '[A]n employee may be excluded as managerial only if he represents management interests by taking or recommending discretionary actions that effectively control or implement employer policy.' " (quoting *National Labor Relations Board v. Yeshiva University*, 444 U.S. 672, 683 (1980))).

¶ 94        In *Board of Regents of the Regency Universities System v. Illinois Educational Labor Relations Board*, 166 Ill. App. 3d 730, 737-43, 520 N.E.2d 1150, 1154-59 (1988), this court considered whether the Board erred in concluding center directors employed at Sangamon State University were not managerial employees as defined by the Act. The center directors, along with other staff, operated the university's public affairs centers. *Id.* at 737. In concluding the center directors were not managerial employees, the Board reasoned, in part, the (1) "directors' authority over the day-to-day operations [was] restricted by other entities, and their authority over personnel [was] substantially 'diffused' through the entire faculty in the process of faculty self-governance" and (2) directors shared "a 'community of interest' with other [faculty members], retain[ed] rank as tenured faculty in academic programs, and spen[t] much of their employment time performing duties similar to those of other faculty." *Id.* at 739.

¶ 95        In reviewing the Board's decision, we acknowledged the diffusion of governing authority practiced by many institutions of higher learning and agreed with the Board's finding

- 25 -

that center directors shared a community interest with other faculty. *Id.* at 742-43. However, we concluded the center directors' duties and responsibilities were such that they should "not be in a position requiring them to divide their loyalty to the administration of [the university] with their loyalty to an exclusive collective-bargaining representative." *Id.* at 743. We found the center directors performed a variety of managerial functions through their responsibilities and duties, which, in part, related to (1) maintaining the day-to-day operations of the centers, (2) seeking personnel for the center and having absolute power to reject any faculty member from working at the center, (3) seeking grants and projects, (4) negotiating on behalf of the university with outsiders and faculty over the shape and focus of projects and having the responsibility of assuring projects were completed within the objectives and capabilities of the center, (5) rejecting proposed projects, (6) having the ability to change the focus of a center, (7) matching faculty with projects, and (8) monitoring projects conducted by faculty. *Id.* at 742.

¶ 96　　　　　In reversing the Board's decision, we acknowledged the Board's decision in *University Professionals of Illinois, Local 4100*, 2 PERI ¶ 1069 (IELRB 1986), which rejected an ALJ's determination that department chairs at Illinois State University and Northern Illinois University should be excluded from inclusion in a bargaining unit consisting of tenure-system faculty because they were both supervisors and managerial employees as defined by the Act. *Board of Regents of the Regency Universities System*, 166 Ill. App. 3d at 742. Without addressing the correctness of the Board's decision, we found it to be distinguishable. We found, unlike the department chairs which the Board found to represent the faculty and its concerns at the higher level of administration, the center directors represented the higher administration in negotiation and otherwise dealing with the faculty and the public. *Id.* Because the Board's

decision was distinguishable, we did not consider it further.

¶ 97    Shortly after issuing our decision in *Board of Regents of the Regency Universities System*, the Board issued a decision in *Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197. In that decision, the Board addressed, in part, whether department chairs employed at Southern Illinois University at Carbondale, Southern Illinois University at Edwardsville, and Southern Illinois University at Edwardsville School of Dental Medicine were managerial employees as defined the Act. The majority of the Board initially acknowledged the question presented was a "difficult" one. The majority concluded the chairs were not managerial employees, in part, because (1) they represented their departments to higher administration, (2) their authority emanated from the faculty as they were subject to recall and votes of confidence by the faculty, and (3) their authority was diffused by concurrent faculty votes and recommendations or by review by upper management. The majority also found several of the chairs' duties were ministerial, rather than executive or management, functions. In part, the majority found the chairs' duties in assigning and scheduling classes was ministerial as it was a routine activity, which relied on faculty preferences, and the chairs were powerless to force a faculty member to teach a particular course. The majority also found the chairs' role in disciplinary matters to be negligible, if not nonexistent, given the rarity of such action and the fact the dean was ultimately responsible for investigating and imposing discipline. The majority concluded the predominant function of department chairs was neither executive nor management but rather ministerial and academic.

¶ 98    The Board's dissenting member found the department chairs to be managerial employees as defined by the Act. The dissent found the chairs made a significant number of

independent recommendations on important personnel and budgetary matters. In part, the dissent highlighted the chairs' roles in (1) hiring, evaluating, and terminating adjuncts; (2) evaluating graduate assistants; (3) representing the university in the first step of the grievance process; (4) serving as the fiscal officers of departmental budgets; and (5) representing the department and the university in accreditation matters. While the dissent agreed with the majority's conclusion the chairs served the faculty, the dissent also found the chairs served the higher administration. In effect, the dissent found the chairs served two masters: the faculty and the higher administration. In comparing the chairs' executive and management functions against their other faculty duties and responsibilities, the dissent found the chairs were predominantly engaged in the executive and management functions and those functions showed they were charged with the responsibility of directing the effectuation of management's policies and practices. In reaching this conclusion, the dissent distinguished *University Professionals of Illinois, Local 4100*, 2 PERI ¶ 1069, noting, unlike the chairs in that case which did not independently and effectively make recommendations in important employment areas, the chairs' recommendations were often effective. The dissent found our prior decision in *Board of Regents of the Regency Universities System*, 166 Ill. App. 3d 730, "compel[led]" the conclusion the chairs were managerial employees as the center directors in that case had comparable, but generally far less, authority than the chairs. *Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197 (dissenting opinion).

¶ 99    In the present case, the Board, relying primarily on its prior decision in *Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197, concluded the department chairs are not managerial employees as defined by the Act. Again, the Board's reasoning for its conclusion is

- 28 -

as follows:

> "[T]he department chairs at [the] University's Springfield campus do not have the authority and discretion which are necessary to establish managerial status. Rather, the University Statutes and the testimony establish that *** the faculty share authority with the chairs. In addition, *** the chairs' role is to represent the departments to higher levels of administration rather than the reverse. The chairs' role in the college cabinets is to act as liaisons between the deans and the department faculty rather than to exercise the type of independent authority to determine the means by which the University's goals will be achieved which is necessary for managerial status. In any event, the department chairs' participation in the college cabinets is not 'uppermost in importance and influence' among their functions. The chairs' predominant role is to work with the faculty in operating the departments."

¶ 100    In reaching its decision, the Board did not make an express finding as to whether the chairs perform executive and management functions. The Board appears to concede the chairs perform at least some executive and management functions, given its comments concerning the chairs' participation in college cabinets (leadership committees) and its finding indicating "[t]he chairs predominant role is to work with the faculty *in operating the departments*." (Emphasis added.) See also *Department of Central Management Services*, 2011 IL

- 29 -

App (4th) 090966, ¶ 134 (finding executive and management functions include running a department and assuring it operates effectively). Before this court, neither the Board nor the Union address whether the chairs perform executive and management functions.

¶ 101    Based on the record before us—and in the absence of any argument to the contrary—we conclude the department chairs perform executive and management functions. As the Board of Trustees asserts, chairs are responsible for (1) hiring, evaluating, and removing adjuncts; (2) controlling their departmental budgets; (3) ensuring various academic and accreditation reports are completed; and (4) maintaining the student population. In addition, chairs (1) attend leadership meetings; (2) oversee the hiring, supervising, and evaluating of graduate assistants; (3) ensure course schedules are prepared and submitted to the dean; and (4) handle disputes between faculty and complaints raised by students and University support staff. In short, the chairs are responsible for running their departments. See *Board of Regents of the Regency Universities System*, 166 Ill. App. 3d at 742 (finding the center directors performed managerial functions based on their responsibilities and duties relating to running the university's public affairs centers).

¶ 102    In reaching its decision, the Board found "the department chairs' participation in the college cabinets [(leadership meetings)] is not 'uppermost in importance and influence' among their functions." It also, again, found "[t]he chairs' predominant role is to work with the faculty in operating the departments." Before this court, the Board asserts:

> "[T]o the extent that chairs exercise independent authority to hire
> or discharge adjuncts, those functions are not 'uppermost in
> importance and influence.' [Citation.] Chairs thus are not

- 30 -

predominately engaged in that activity. Rather, *** their

predominant role is to work with the faculty in operating the

department."

The Union argues, citing our decision in *Board of Regents of Regency Universities System*, the

managerial exclusion does not apply because the evidence showed the chairs spent a majority of

their time on faculty, as opposed to managerial, duties.

¶ 103　　　　We initially reject the Union's argument as it is contrary to established case law.

In *Board of Regents of the Regency Universities System*, 166 Ill. App. 3d at 743, we noted, given

the fact the center directors had half-time faculty appointments, the evidence was close as to

whether they spent a sufficient portion of their time on managerial duties to be considered

engaged predominantly in executive and management functions. However, because the

predominance issue had neither been addressed nor considered by the Board, we did not address

the issue further. *Id.* Thereafter, in *Board of Trustees of Southern Illinois University*, 5 PERI

¶ 1197, the Board addressed the "predominance" issue. It found " 'predominantly' " was not a

pure quantity of time measurement—it was not a "50-percent-plus-one-test." *Id.* Rather, it

included a consideration of whether the management and executive functions were " 'uppermost

in importance and influence.' " *Id.* Our courts have since adopted the Board's predominance

analysis. See *Chicago Teachers Union*, 296 Ill. App. 3d at 793 (citing *Board of Trustees of*

*Southern Illinois University*, 5 PERI ¶ 1197); *American Federation of State, County, &*

*Municipal Employees (AFSCME), Council 31*, 2014 IL App (1st) 130655, ¶ 29. Accordingly,

even if we found the record supported a finding the chairs spent a majority of their time on

faculty duties, that finding alone would not preclude a finding of managerial status.

¶ 104        As to the Board's findings and argument before this court, we again note the Board does not address the majority of the executive and management functions performed by the department chairs and whether those functions can be considered uppermost in importance and influence. In its written decision, the Board found "the chairs' participation in the college cabinets [(leadership meetings)] is not 'uppermost in importance and influence' among their functions." Before this court, the Board further argues the chairs' authority to hire and discharge adjuncts is "not 'uppermost in importance and influence.' " We reject the Board's conclusory findings and argument. On a campus which employs 193 full-time faculty members and 165 adjunct faculty members, we find the function of hiring, evaluating, and discharging the adjunct faculty to be of the uppermost in importance and influence. We also find the chairs participation in college cabinet meetings, where discussion occurs concerning the college budgets, the direction of the college, faculty resources, and strategic and policy issues, to be of the uppermost in importance and influence. These executive and management functions, amongst others, have a direct and critical impact on the University, the campus, and the individual colleges and departments. While the evidence varied as to the amount of time chairs spent on their departmental duties, it is clear those duties were of the uppermost in importance and influence. As the Board of Trustees argues, we find the record shows department chairs are predominantly engaged in performing their executive and management functions.

¶ 105        In reaching its decision, the Board, relying primarily on its prior decision in *Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197, found department chairs did not have the requisite responsibility for running their departments to be considered managerial employees. Specifically, the Board found chairs (1) shared their decision-making authority with

other faculty members, (2) represented the departments to higher levels of administration rather than the reverse, and (3) did not exercise the type of independent authority—at least as it related to their participation in college cabinets—to determine the means by which the Board of Trustees' goals would be achieved. Before this court, the Board, continuing to rely on *Board of Trustees of Southern Illinois University*, 5 PERI ¶ 1197, asserts the chairs do not meaningfully direct the effectuation of departmental policies and practices given the fact the (1) University system operates under a model of shared governance, (2) chairs' authority emanates from the faculty, and (3) chairs often work collaboratively with the faculty to fulfill the academic mission of the department. The Union makes similar assertions.

¶ 106    We recognize the diffusion of governing authority practiced by many institutions of higher learning and agree with the Board's finding the department chairs share a community interest with other faculty in fulfilling the academic mission of their respective departments. However, as we found in *Board of Regents of the Regency Universities System*, 166 Ill. App. 3d at 742-43, a community interest and the diffusion of governing authority alone do not preclude a finding of managerial status under the Act. See also *Department of Central Management Services*, 2011 IL App (4th) 090966, ¶ 186 ("[E]xclusivity in the implementation of management policy is not a requirement under that Act.").

¶ 107    The evidence showed the department chairs had independent authority to establish and effectuate departmental policy. As provided in the University Statutes, chairs are "responsible for the formulation and execution of departmental policies." We acknowledge many chairs collaborate with their fellow faculty members in fulfilling their executive and management duties. However, the chairs are not required to do so. That is, the chairs exercise their

- 33 -

independent judgment in deciding when it is appropriate or necessary to collaborate with their colleagues. The chairs' consultation does not abdicate their independent judgment. The chairs alone are responsible for fulfilling their executive and management duties. The means by which the chairs execute their duties establish and effectuate departmental policy. The execution of these duties has a direct impact on the working conditions of the tenure-system faculty. That is, the chairs have the power to affect the working conditions of their colleagues. While several of the chairs' decisions are reviewed by higher level administration, the evidence shows the chairs' decisions are often effective. See *Department of Central Managment Services*, 2011 IL App (4th) 090966, ¶ 135 (noting managerial status will be found where an employee has the ability to make recommendations that are almost always implemented). Additionally, while the faculty may move to remove a sitting chair, a dean may object to such removal, which would require the faculty to take additional procedures to attempt to override the dean's objection.

¶ 108     The evidence also showed the department chairs are responsible with effectuating University and college policies. As provided in the University Statutes, chairs are "responsible for *** the execution of [u]niversity and college policies insofar as they affect the department." We agree with the Board's finding the chairs represent the faculty before the Board of Trustees. However, the evidence also shows the chairs represent the Board of Trustees before the faculty. While a department's faculty selects a proposed chair, the dean must review that selection and the chair must receive a recommendation of appointment by the president and chancellor/vice president. As Taylor explained, while the appointment of a chair involved significant collaboration with a department's faculty, the Board of Trustees did not allow the faculty to directly appoint a chair because the chair was also responsible for carrying out the agendas of the

college and the Board of Trustees. The evidence shows the chairs currently resolve grievances, and it is expected they will continue to do so under the first contract of the tenure-system faculty bargaining unit. That is, the chairs are in a position to resolve grievances in the interest of the Board of Trustees. At college cabinet meetings, the chairs discuss with the dean various issues concerning the college, and the dean may task the chairs with handling assignments delegated from the provost's office. Chairs are also responsible for representing the University in accreditation matters. Importantly, unlike a department's faculty, a dean has the ability to unilaterally remove a sitting chair.

¶ 109    We find the record demonstrates the department chairs have the requisite responsibility of directing the effectuation of management policies and practices to be considered a managerial employee. In sum, the record shows department chairs are managerial employees as defined by the Act. The Board's decision to the contrary is clearly erroneous.

¶ 110    Our supreme court has stated the managerial exclusion "is intended to maintain the distinction between management and labor and to provide the employer with undivided loyalty from its representatives in management." *Chief Judge of the Sixteenth Judicial Circuit v. Illinois State Labor Relations Board*, 178 Ill. 2d 333, 339, 687 N.E.2d 795, 797 (1997); see also *Chicago Teachers Union*, 296 Ill. App. 3d at 793-94. As it stands, the Board's decision requires the department chairs to divide their loyalty between the University's administration and the tenure-system faculty bargaining unit. Such a decision cannot stand.

¶ 111                      III. CONCLUSION

¶ 112    We reverse the Board's decision.

¶ 113    Reversed.